STATE, Respondent, vs. JOHNSON and others, Appellants: KRAUSE and others, Respondents.

*January 13—February 10, 1925.*

*Depositories: Public moneys: State board of deposits: Instruction to state treasurer to decrease deposit in designated bank: Renewal of term as state depository: Statutes: Practical construction by state officers.*

1. The state board of deposits, by instructing the state treasurer on a certain day to decrease rather than increase the amount on deposit in a certain depository, did not prescribe the maximum amount of deposits in such depository, under sec. 14.46, Stats., providing that the amount on deposit shall not exceed the amount prescribed by the board of deposits, if any be prescribed, since such statute contemplates a definite and fixed amount.   p. 63.

2. The instruction of the state board of deposits did not make the treasurer and his sureties liable, under sec. 14.46, Stats., upon the insolvency of the bank almost eight years thereafter with deposits in excess of the amount on deposit at the time of the instruction, in the absence of intervening instructions and in view of the execution of two new bonds by the bank during the interval, the examination of the bank by the banking commissioner, and the submission of reports by the bank, without any objection to the deposit of funds in the bank, since under the circumstances the board of deposits acquiesced in and ratified the deposit of funds in such bank, and the execution of a new bond created a new term as depository to which the instruction was not applicable.   p. 68.

3. The state treasurer and the members of the state board of deposits are not required to make a personal examination of the securities contained in depository banks, or to verify the genuineness of the assets of the bank, but are presumed to rely on the various reports made by the bank.   p. 67.

4. This court must assume that the state treasurer and other members of the state board of deposits performed their duties with respect to depository banks.   p. 67.

5. Where no order is made by the state board of deposits on the expiration of a depository bond, and the bank submits a new bond which is approved, the bank enters upon a new term of four years as a depository.   p. 68.

6. The construction placed upon statutes by the proper state officers is of great weight and is oftentimes decisive.   p. 68.

APPEAL from an order of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Reversed.*

The appeal is from an order of the circuit court overruling the demurrers of the appellants to the amended complaint of the plaintiff and the cross-complaints of the defendants.

The amended complaint, among other things, alleges that the defendant *Johnson* was the duly elected and qualified treasurer of the state from January 6, 1913, to January 1, 1923; that the corporations appealing herein are the sureties upon his bonds; that at all times mentioned in the complaint the Jackson State Bank was a state banking corporation, and, having complied with all the requirements of law, was designated as a depository for the deposit by the state treasurer of state funds.

The defendants and respondents herein are the sureties on the bonds of the bank, which were executed in order to qualify such bank from time to time as a state depository; that on the 11th day of February, 1915, the state treasurer had on deposit in said bank state funds amounting to $5,561.12; and that the board of deposits on that day instructed the treasurer to decrease instead of increase the amount of state funds on deposit in said bank; that on the 22d day of December, 1922, it appearing that said bank was insolvent, the banking commissioner took possession of the same, with all the assets of the institution, for the purpose of liquidating its affairs, and that such liquidation proceedings still continue and are not completed; that the defendant *Johnson,* as state treasurer, from time to time after the instructions thus given by the state board of deposits, violated the same and continued to make deposits in said bank and to withdraw funds therefrom, in such a manner as to leave large balances in excess of $5,561.12 on deposit in said bank; that at the time the banking commissioner assumed charge of the affairs of the bank, the amount on deposit by the state treasurer in said bank was the sum of $19,044.09, which amount has been reduced by dividends in the sum of $3,808.32.

In its complaint the plaintiff prays for judgment against *Johnson* and the sureties on his bonds, and also against the sureties of the bank, for the amount of the balance and interest due it, etc. The various defendants, sureties upon the bonds of the depository, in their cross-complaints duly filed and served pray for judgment against *Johnson* and the sureties on his official bonds for the amount of their liability when determined, upon the theory that the loss was sustained by the failure of the state treasurer to comply with the instructions of the state board of deposits as aforesaid. The defendant *Johnson*, and the sureties upon his bonds, each served and filed a general demurrer to the complaint of the plaintiff, and they likewise demurred to the cross-complaints of the sureties upon the bonds of the depository, which demurrers were by the order of the trial court overruled; and from such order the appellants herein have prosecuted this appeal.

For the appellant *Johnson* and the sureties on his official bond there was a brief signed by *Olbrich, Brown & Siebecker* of Madison, attorneys; *McGovern, Hannan, Devos & Reiss* of Milwaukee, attorneys for the *Maryland Casualty Company* and the *Fidelity & Casualty Company; Upham, Black, Russell & Richardson* of Milwaukee, attorneys for the *American Surety Company*, and *M. B. Olbrich* of Madison, of counsel; a supplemental brief by *McGovern, Hannan, Devos & Reiss* and *Upham, Black, Russell & Richardson;* and the cause was argued orally by *Mr. Olbrich* and *Mr. F. E. McGovern.*

For the respondent *State of Wisconsin* there was a brief by the *Attorney General* and *Winfield W. Gilman* of Milwaukee, special counsel, and oral argument by *Mr. Gilman.*

For the respondents *Krause* and others there was a brief by *Frank W. Bucklin* of West Bend and *William Ryan* of Madison, and oral argument by *Mr. Ryan.*

For the respondents *Groth* and *Jaeckel* there was a brief by *O'Meara & O'Meara* of West Bend, and oral argument by *P. J. O'Meara.*

For the respondent *Dallmann* there was a brief by *Larson, Seher & Seher* of Milwaukee, and oral argument by *Arthur J. Seher*.

DOERFLER, J.   Under the provisions of sec. 7, art. X, of the constitution, the secretary of state, the treasurer, and the attorney general shall constitute the board of commissioners of public lands.  Sec. 14.43 of the Statutes provides:

."Any national or-state banking corporation which is approved by the 'board of deposits,' consisting of the commissioners of public lands and the governor, may, upon filing a bond as hereinafter provided, and upon the compliance with all other requirements of law, become a state depository. . . ."

Sec. 14.46 provides:

"*Treasurer's liability.*   Under the direction of the board of deposits, the state treasurer may deposit with any depository which has fully complied with all requirements of law any state moneys in his hands or under his official control, and any sums so on deposit shall be deemed to be in the state treasury, and said treasurer shall not be liable for any loss thereof resulting from the failure or default of any such depository without fault or neglect on his part or on the part of his assistant or clerks.   However, the amount at any time on deposit with any depository shall not exceed its actual paid-up capital, nor one half of the penalty of the bond filed by it, nor the amount prescribed by the board of deposits, if any be prescribed."

Sec. 14.48 requires the state depository to file with the secretary of state on the first day of each month, and oftener when required, a sworn statement of the amount of public moneys deposited with it, and a quarterly statement of all deposits and payments of state moneys during the preceding quarter, etc.   Sub. (8) of sec. 14.42 requires the treasurer to report to the governor quarterly the amounts that are on deposit in each of the state depositories, etc.   Sec. 14.66 requires the governor and the attorney general to examine the

accounts of the state treasurer at least once in each quarter. Sub. (3) of sec. 14.44 requires every bank designated as a state depository to renew its bonds to the state treasurer every four years, unless otherwise ordered by the state board of deposits. The board of deposits may also require new bonds at any time when they deem it necessary.

The foregoing statutes, with few changes not material here, have been in force during all periods of time involved herein. The moneys deposited by the state treasurer in these depository banks, under the express language of the statute, are deemed to be in the state treasury. The provisions of sec. 14.46, which limits the amount which a state treasurer can legally deposit with an approved depository to the amount of the actual paid-up capital of the bank and one half of the penalty of the bond filed by it, are general provisions and apply equally to all state depositories. No warrant can be given to the treasurer in any event to exceed these specific limitations, and no claim is made herein by any of the parties that such limitations have been exceeded.

It is argued, however, by the attorney general and counsel for the sureties on the bonds of the depository, that where an amount is fixed below the general limitations above referred to, by the state board of deposits, it becomes an imperative duty on the part of the state treasurer not to exceed this amount, and that a failure to comply with the directions of the board of deposits in this behalf amounts to a violation of the statutory duties of the treasurer, pursuant to which a liability springs up in favor both of the state and of the sureties of the depository. The instructions given by the state board of deposits on February 11, 1915, are not couched in as clear and definite language as the statute would seem to require. The statute contemplates a definite and fixed amount. The instructions given are that the treasurer shall decrease instead of increase the amount to be deposited. This instruction does not fix a definite amount of the decrease, so that the logical meaning of such instruction

would amount to a limitation to the amount on deposit on the day the instruction was given. Before a depository can receive deposits of the state treasurer it must not only furnish the requisite bond, but it must be approved as a depository by the state board of deposits. Furthermore, under sec. 14.47 the board must be satisfied that the corporation is prosperous and financially sound, and has, unimpaired, the paid-up capital claimed by it. Under the provisions of sub. (2) of sec. 14.44 the board of deposits may also require the banking commissioner to thoroughly investigate and report to it concerning the condition of any bank which makes application to become a state depository, and may also, as often as it deems necessary, require such investigation and report concerning the condition of any bank which may have been designated as such depository. Ample provision is therefore made by the legislature to ascertain reasonably the condition of a bank before it is approved as a depository. A depository may be grossly insolvent and yet the state may be fully secured by its bond. The legislature undoubtedly had in mind not only the mere matter of security, which involves its ability to recover the whole amount deposited, but it also clearly had in mind the ability of the depository to respond on demand; and here it must be borne in mind that all deposits of a state treasurer in a depository bank must be made payable on demand. In other words, the deposits are subject to call. It is evident also that a bank may be perfectly solvent, and even prosperous, yet its assets may be of such a nature as to prevent them from being readily liquidated; and such a situation, while not endangering the security of the state, might greatly hamper the state treasurer's ability to meet the obligations of his office. In other words, the bank's assets might consist largely of what are known as frozen assets. So that, as we view it, the legislature had a dual purpose in mind when it required not only proper security in the form of a bond, but ability on

State v. Johnson, 186 Wis. 59.

the part of the depository to respond to any call or demand instantaneously.

Sec. 14.47 clearly indicates that, before a bank can be designated as a depository, the board of deposits must be satisfied that the corporation is prosperous and financially sound, and has, unimpaired, the paid-up capital claimed by it. If this showing is necessary as a condition precedent to the bank becoming a depository, then it would necessarily follow that, after the bank becomes a depository, any showing made by its reports or otherwise, to the state officers or the board of deposits, to the contrary, would require an instruction or direction to the state treasurer to withdraw the state funds from the depository and to cease recognizing it as a state depository. On the other hand, if the reports submitted to the state officers and the board showed a lack of quick assets, or assets which could not readily be liquidated and converted into cash, which in the opinion of the board would make it impossible for the bank to respond immediately to any call made upon it by the state treasurer, then the danger might arise to the state of being unable to procure the necessary funds required for the discharge of state obligations. The one situation affects the security of the state, while the other goes to the immediate availability of the funds, and constitutes principally an inconvenience.

While the pleadings do not show the reason for the instructions of the board in 1915, the logical and irresistible conclusion would be, not that the bank was insolvent or in a failing condition or that its actual paid-up capital stock was impaired, but that it did not have on hand a sufficient amount of quick assets, and that its assets largely were of such a nature as to prevent them from being readily and quickly converted into cash so as to enable the bank to promptly respond to any call made upon it by the state treasurer. This view in a measure explains the peculiar wording of the instruction given the treasurer by the board.

Prior to the year 1891 the treasurer, as held in the *State Treasury Cases* (*State v. Harshaw,* 84 Wis. 532, 54 N. W. 17; *State v. McFetridge,* 84 Wis. 473, 54 N. W. 1, 998; and *State v. Sawyer,* 84 Wis. 532, 54 N. W. 17), was a practical insurer of the funds coming into his possession in his official capacity. In that year ch. 273 of the Laws of 1891 was passed, which authorized the creation of the state depositories, and which relieved the state treasurer from liability upon compliance with the law. That law, with a few changes, has been continued and carried into our present statutes. In order that the security of the state funds might be assured, the legislature has seen fit to create ample machinery designed to bring knowledge to the members of the state board of deposits of the actual condition of these depositories from time to time.

In two of the cross-complaints it is alleged that the Jackson State Bank was insolvent for the period of over a year prior to the time that it passed into the hands of the banking commissioner. There is no allegation in the pleadings that the state treasurer at any time had knowledge of the insolvency of the bank prior to the time it was actually declared an insolvent institution. It is not improbable that this insolvency actually existed for a long period of time before the bank was declared insolvent, and this notwithstanding the numerous examinations made between 1915 and 1922 by the banking commissioner. The banking commissioner is, under the statutes, obligated to make periodical examinations of the state banks in the state. Experience has shown that in many instances where the banks were taken over by the commissioner of banking the institutions had been grossly insolvent for a long period. This can only be explained upon the theory that in the checking up of the assets of the bank fictitious and forged securities were presented for the approval of the examiner. With the force at the disposal of the banking department it would seem nigh impossible for the department to verify the genuineness of all

of the securities submitted to it when it makes an examination of the affairs of a bank. So that in the instant case it unquestionably appeared from the paper reports of the depository and of the banking department that the bank during all of the years herein involved was sound financially. The state treasurer and the members of the board of deposits are not expected to make a personal examination of the securities contained in these depository banks, or to verify the genuineness of the assets of the bank; on the contrary, they are presumed to rely upon the various reports as made.

We must assume that the state treasurer and the other members of the board at all times performed their duty. Considering, therefore, the monthly reports submitted by the bank in question to the secretary of state, the quarterly reports furnished to the governor, the periodical examination of the books of the state treasurer by the governor and the attorney general, as required by the statutes, the repeated periodical reports of the banking commissioner, and the reports of the bank to the banking commissioner, how can it be successfully claimed that the state treasurer had violated the instructions of the state board of deposits? An examination of the exhibits attached to the complaint clearly shows that, with few exceptions, the monthly reports of the depository showed the balance of state funds on deposit with it in excess of the amount on deposit on February 11, 1915. The same appears from the exhibit attached to the complaint showing the quarterly reports to the governor.

The failure of the bank occurred almost eight years after the giving of the alleged instructions in 1915. In 1918 new bonds were submitted by the depository and approved by the board of deposits. It must be assumed (and nothing to the contrary appears in the pleadings) that before these bonds in 1918 and 1922 were approved a proper examination was made by the banking commissioner of the condition of the bank and a favorable report submitted. No

claim is made in the pleadings that the banking commis-
sioner and the members of the board of deposits did not per-
form their full duty, not only with respect to requiring a
proper bond but with respect to the ascertainment of the
actual financial condition of the bank.   With a continued
uniformity of deposits of the state treasurer from 1916 on,
in excess of the amount limited by the instructions of Febru-
ary 11, 1915, the conclusion is irresistible that any objections
or criticisms which the state board of deposits had in mind
on said last named date had been fully removed and reme-
died.   Under the facts and circumstances shown by the
pleadings, the board of deposits not only acquiesced in the
acts of the treasurer but expressly ratified the same.

Sub. (3) of sec. 14.44 requires every bank designated as
a state depository to renew its bonds to the state treasurer
every four years, unless otherwise ordered by the state board
of deposits.   The phrase "unless otherwise ordered by the
state board of deposits" implies a situation where the board
refuses to further recognize the bank as a state depository.
Where no order is made by the board, and the bank submits
a new bond which is approved, the bank enters upon a new
term of four years as a depository.   This construction ap-
pears to us to be based upon sound logic.   Every bond must
be executed with proper sureties.   Personal sureties that
are perfectly solvent at the beginning of the term may be-
come insolvent during the term.   Furthermore, individual
sureties may die or remove from the jurisdiction of the
state.   Surety companies also may be perfectly sound when
the bond is executed, and during the four-year period may
suffer great losses so as to impair their capital.   It is this
reason that the legislature evidently had in mind when it
definitely limited the term of the bond to four years.   While
the statute requires the renewal of a bond, it clearly does
not contemplate the continuance of the old bond.   This is
the construction placed upon the statute by the proper state
officers and the board of deposits.   Such a practical con-

struction is of great weight and is oftentimes decisive. *State ex rel. Board of Regents v. Zimmerman,* 183 Wis. 132, 197 N. W. 823.

The pleadings do not allege that the state board of deposits made an order, either in 1918 or 1922, with respect to the bank either acting as a further depository or with respect to the bond of the depository. The bank, therefore, in compliance with the statutes, furnished new bonds which were properly approved. This in effect created a new term for the depository, and the condition of the bank having in all respects been ascertained and reported on favorably by the proper officers, any instruction or direction by the board of deposits given prior thereto came to an end, and the treasurer thereafter was authorized to make deposits, under the general provisions of the statutes, up to the limit of the amount of its capital stock or to the amount represented by one half of the penalty of the bonds.

For the reasons stated, we conclude that the court erred in overruling the demurrers. Other questions are raised in the briefs of counsel which we do not deem it necessary to consider, because the conclusions arrived at herein effectually dispose of the issues raised.

*By the Court.*—The order of the lower court is reversed, and the cause is remanded with directions to the lower court to enter an order sustaining the demurrers.