EUNICE GIBSON, Chairperson State Personnel Board
You state that the Personnel Board has been asked to approve a classification survey for the clerical occupational group, and that approval of the survey would include approving the assignment of classes to different pay rates or ranges, as provided in sec. 230.09 (2) (b), Stats. The Civil Service Reform Act, ch. 196, Laws of 1977, renumbered and amended sec. 230.09
(2)(b), Stats., to provide:
 To accommodate and effectuate the continuing changes in the classification plan as a result of the classification survey program and otherwise, the administrator with approval of the board shall, upon initial establishment of a classification, assign that class to the appropriate pay rate or range, and upon subsequent review, the administrator with approval of the board may reassign classes to different pay rates or ranges. The administrator shall apply the principle of equal pay for work of equivalent skills and responsibilities when assigning a classification to a pay range.
You request my opinion on two questions:
 1. In view of the foregoing statutory requirement, may the Board approve the classification survey if there is evidence that certain clerical workers are assigned to lower pay ranges than those assigned to state employes who perform work of equivalent skill and responsibility, but who are in a different occupational group?
 2. In connection with approval of classification surveys as indicated above, does the Board have power to approve a survey retroactively?
The answer to your first question, for the reasons set forth below, is no. The Personnel Board may not approve the assignment of a classification to a disparate pay range than the pay range to which a classification in a different occupational group is assigned if the classifications include positions involving work of equivalent skills and responsibilities. The answer to your second question, for the reasons *Page 192 
set forth below, also is no. The Personnel Board may not approve retroactively the establishment of classifications and grade levels or the assignment of classifications to the appropriate pay rate or ranges.
I. The Classification Process
It is the responsibility of the administrator of the Division of Personnel to establish classifications and grade levels for all positions in the classified service. Sec. 230.09 (1) and (2)(a), Stats. The administrator also must assign each classification to the appropriate pay rate or range. Sec. 230.09
(2)(b), Stats. The establishment of classifications and the assignment of classifications to a pay range are subject to the approval of the Personnel Board. Sec. 230.09 (1) and (2)(b), Stats.
In order to maintain and improve the classification plan to meet the needs of the service, the administrator is directed to use methods including occupational group classification surveys. Sec. 230.09 (2)(am), Stats. Based upon such surveys, the administrator may establish, modify or abolish classifications, and may assign or reassign classifications to different pay rates or ranges. Sec. 230.09 (2)(am) and (b), Stats. Such actions of the administrator also are subject to the approval of the Personnel Board. Id.
Your first question may be divided into two parts. The first part concerns the meaning of the phrase "the principle of equal pay for work of equivalent skills and responsibilities" contained in sec. 230.09 (2)(b), Stats. The second part concerns whether such principle must be applied to classifications in different occupational groups.
Answering the second part first, it is my opinion that the equal pay principle contained in sec. 230.09 (2)(b), Stats., must be applied to all classifications which include positions involving work of equivalent skills and responsibilities,regardless of occupational group. Although the administrator may establish, modify, or abolish classifications, and may assign or reassign classifications to different pay rates or ranges as the result of an occupational group classification survey, sec.230.09 (2) (am), Stats., the administrator must consider classifications both in that occupational group and in different occupational groups when assigning classifications to a pay range in *Page 193 
accordance with the equal pay principle contained in sec. 230.09
(2)(b), Stats. There is nothing express or implied in sec. 230.09
(2) (b), Stats., which would limit the administrator's application of the equal pay principle to classifications within the same occupational group.
II. The Equal Pay Principle.
Section 230.09 (2) (b), Stats., directs the administrator, subject to board approval, to "apply the principle of equal payfor work of equivalent skills and responsibilities when assigning a classification to a pay range." The remaining part of your first question requires ascertaining the legislative intent in using the language emphasized above. In order to ascertain the legislative intent, it is helpful and perhaps necessary to examine the history of the equal pay principle under the federal Equal Pay Act, 29 U.S.C. sec. 206 (d).
The Equal Pay Act, 29 U.S.C. sec. 206 (d), provides in part:
 (1) No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex.
(Emphasis added.)
The legislative history of the Equal Pay Act clearly reveals that the Act was not intended to require equal pay for jobs ofdifferent content. Angelo v. Bacharach Instrument Co., 555 F.2d 1164,1173 (3rd Cir. 1977); Hodgson v. William Mary NursingHotel, 65 CCH L. C. par. 32,497 (M.D. Fla. 1971). As originally introduced, the bill provided for equal pay for "work ofcomparable character on jobs the performance of which requirescomparable skills." H.R. 8898, 87th Cong., 1st Sess. sec. 4 (1962), and H.R. 10226, 87th Cong., 2d Sess. sec. 4 (1962) (emphasis added). After considerable debate, the House substituted "equal work" for "comparable work." *Page 194 
H.R. 11677, 87th Cong., 2d Sess. (1962); 108 Cong. Rec. 14771 (1962). The bill was not passed, however, in the 87th Congress.
In 1963, the House bill, H.R. 6060, 88th Cong., 1st Sess. (1963), again used the phrase "equal work" instead of "comparable work." The bill was passed by the House even though several legislators expressed concern that the bill did not go far enough and that it had been weakened by the substitution of the word "equal" for the word "comparable." 109 Cong. Rec. 9200-9205 (1963). The House bill added the phrase "equal skill, effort, . . . responsibility, and . . . similar working conditions" in order to define what is meant by "equal work." 109 Cong. Rec. 9197-9198 (1963); Corning Glass Works v. Brennen,417 U.S. 188, 200-202 (1974). The Senate concurred in the House bill without modification and the result was the Equal Pay Act.
During the House debate, the floor-managers of the bill, Congressmen Goodell and Griffin, engaged in the following colloquy, 109 Cong. Rec. 9197-9198 (1963):
 Mr. GOODELL . . . . I think it is important that we have clear legislative history at this point. Last year when the House changed the word "comparable" to "equal" the clear intention was to narrow the whole concept. We went from "comparable" to "equal" meaning that the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other.
 We do not expect the Labor Department people to go into an establishment and attempt to rate jobs that are not equal. We do not want to hear the Department say, "Well, they amount to the same thing," and evaluate them so they come up to the same skill or point. We expect this to apply only to jobs that are substantially identical or equal. I think that the language in the bill last year which has been adopted this year, and has been further expanded by reference to equal skill, effort, and working conditions, is intended to make this point very clear.
 Mr. GRIFFIN. In other words, would the gentleman agree with me that there would be no basis for comparing, say, an inspector with an assembler, for example? The Department of Labor could not say, "Well, now, these two jobs involve about the same level of skill and the same degree of responsibility." It *Page 195 
would be appropriate to compare inspectors with inspectors or assemblers with assemblers, but not to compare an inspector with an assembler.
 Mr. GOODELL. We are talking about jobs that involve the same quantity, the same size, the same number, where they do the same type of thing, with an identity to them.
Courts applying the Equal Pay Act have given effect to its legislative history and uniformly have required that the jobs compared be substantially similar or equal. Shultz v. WheatonGlass Company, 421 F.2d 259, 265 (3rd Cir. 1970), cert. denied,398 U.S. 905 (1970); Angelo v. Bacharach Instruments Co.,555 F.2d at 1173-1175; Hodgson v. Golden Isles Convalescent Homes,Inc., 468 F.2d 1256, 1258 (5th Cir. 1972); Brennan v. CityStores, 479 F.2d 235, 238-239 (5th Cir. 1973); see also, sec.111.32 (5)(g)(1m), Stats. Courts have refused to equalize wages for substantially different jobs merely "to enforce their own conceptions of economic worth." Brennan v. Prince WilliamHospital Corporation, 503 F.2d 282, 285 (4th Cir. 1974), cert.denied, 420 U.S. 972 (1975); Hodgson v. Miller Brewing Co.,457 F.2d 221, 227 (7th Cir. 1972).
III. Interpretation of sec. 230.09 (2) (b), Stats.
Your first question raises the issue of whether the "principle of equal pay" referred to in sec. 230.09 (2)(b), Stats., is the same as or broader than that contained in the federal Equal Pay Act. If the equal pay principle referred to in sec. 230.09
(2)(b), Stats., is the same as that contained in the federal Equal Pay Act, then the administrator must compare only those classifications which include positions involving substantially similar or equal work. Accordingly, clerical workers must be paid the same as state employes in different classifications, including those in different occupational groups, who perform "equivalent" (meaning substantially similar or equal) work.
On the other hand, if the equal pay principle referred to in sec. 230.09 (2)(b), Stats., is broader than that contained in the Equal Pay Act, then the administrator might be required to compare classifications which include positions involving dissimilar work if the "skills and responsibilities" involved somehow are "equivalent" (meaning comparable). Thus, clerical workers would have to be paid *Page 196 
the same as state employes in different classifications, including different occupational groups, who perform "equivalent" (meaning dissimilar but comparable) work.
Section 230.09 (2)(b), Stats., uses neither the word "equal" nor the word "comparable" in defining the word "work." The word "work" is defined, however, by the phrase "of equivalent skills and responsibilities." Since the Equal Pay Act uses a similar phrase ("equal skill, effort and responsibility") in defining what is meant by "equal work," and since the word "equivalent" and "equal" are essentially synonymous, Websters, Third NewInternational Dictionary (1976), pp. 766-767, 769, it reasonably may be inferred that the equal pay principle contained in sec.230.09 (2)(b), Stats., requires equal pay for "equal" work. Given such construction, sec. 230.09 (2) (b), Stats., would not require that clerical workers be paid the same as state employes who perform comparable but not substantially similar or equal work.
In construing a statute, it is permissible to look beyond the language of the statute to its legislative intent only when the statute is ambiguous, i.e., capable of being understood by reasonably well-informed persons in either of two or more senses.Wis. Environmental Decade v. Public Service Comm.,81 Wis.2d 344, 350, 260 N.W.2d 712 (1978); State ex rel. West Allis v.Dieringer, 275 Wis. 208, 218, 81 N.W.2d 533 (1957). To the extent that the word "work" in sec. 230.09 (2)(b), Stats., is not preceded by an express modifier such as "equal" or "comparable," one might decide that the statute is ambiguous. Assuming for discussion purposes that the statute is ambiguous, a review of its history is warranted.
On August 12, 1976, Governor Lucey issued Executive Order No. 33, which established an Employment Relations Study Commission to study and recommend changes in the state civil service system. In its interim report on March 1, 1977, the Commission expressed concern "that positions traditionally filled by women are compensated at a lower level than positions with similar duties and responsibilities, but traditionally filled by men." Report ofthe Employment Relations Study Committee (June 30, 1977) Appendix B, p. 72.
In its final report on June 30, 1977, the Commission recommended, Report, p. 34, that: *Page 197 
 1. The state should provide similar compensation for job classifications of comparable levels of skill and responsibility, regardless of whether those job classifications have traditionally been filled by members of one sex or race.
 2. Internal equity between similar classifications should be established as soon as possible.
(Emphasis added.)
As commentary to these recommendations, the Commission stated in part, Report, p. 34:
 Significantly, the differences [in compensation levels between positions requiring comparable levels of skill, knowledge and responsibility] seem to be related to the influence of the general job market and the general societal patterns of paying lower salaries for jobs traditionally filled by women than for comparable jobs filled by men. These are considerations which cannot be ignored by the state as a responsible employer. Ideally, a compensation plan would be oriented entirely on jobs and career structures and would be blind to traits of employes that are not job-related. The legacy of past practices and traditional patterns in society generally, however, can affect a classification system based on position comparisons. Despite this, the principles of equal pay for equal work and the state's obligation in providing leadership in meeting social goals would seem to press for eventual elimination of sex-role based wage differences.
The Commission's commentary raises questions concerning the intent of its recommendations. The phrase "job classifications of comparable levels of skill and responsibility" in the Commission's recommendations had its own distinct connotations by 1977, different from and broader than the language of the Equal Pay Act ["jobs the performance of which requires equal skill, effort, and responsibility"] . Thus, the recommendations seem to suggest that the Commission favored the broader concept of equal pay for "comparable" work.
On the other hand, the commentary suggests that the Commission was endorsing only "the principles of equal pay for equal work . . . [in order] to press for the eventual elimination of sex-role based wage differences." By 1977, the phrase "equal pay for equal work" clearly *Page 198 
was understood to require equal pay only for substantially similar or equal work. Thus, the intent underlying the Commission's recommendation is ambiguous. Such recommendations cannot serve as a reliable indicator of the Legislature's intent in enacting sec. 230.09 (2)(b), Stats.
On September 9, 1977, Senator Offner, the Commission's co-chairperson, initially recommended that sec. 16.07 (2) (b), Stats. (1975) [now sec. 230.09 (2)(b), Stats.] be amended to include the following language:
 Consideration shall be given to the principle of equal pay for work of equal value when assigning to a pay range a classification having a higher percentage of women and minorities than would be expected based on their percentage in the general labor force where this factor has tended to depress pay rates by other employers.
Memo, September 9, 1977, "Affirmative Action Amendments to SB516."
Instead, however, Senator Offner introduced Senate Substitute Amendment 2 to 1977 SB 15 which provides in pertinent part:
 The administrator shall give consideration to the principle of equal pay for work of equivalent skills and responsibilities, and other appropriate job evaluation factors, when assigning a classification to a pay range.
This same language, except for the phrase emphasized above, remained substantially unchanged in 1977 SSB 2 which was passed in a November, 1977, Special Session and became the Civil Service Reform Act. Ch. 196, Laws of 1977.
There is nothing in the language of sec. 230.09 (2)(b), Stats., as originally introduced or as finally enacted, which evidences any legislative intent to adopt an equal pay principle broader than that developed under the federal Equal Pay Act. The Legislature specifically did not adopt the recommendation of the Employment Relations Study Commission that equal pay be provided for "comparable" job classifications. Perhaps this is because of the Commission's commentary endorsing the principles of equal pay for equal work. It is more instructive that the Legislature used the phrase "the principle" of *Page 199 
equal pay. That principle has come to have a well-defined meaning under the Equal Pay Act.
In any event, when one considers (1) that Congress purposely chose the language equal pay for "equal" rather than "comparable" work when it enacted the Equal Pay Act, (2) that courts uniformly have interpreted the Equal Pay Act as not requiring equal pay for jobs of different content, and (3) that sec. 230.09 (2)(b), Stats., refers to "the principle of equal pay for work ofequivalent skills" and does not contain the language "comparable
levels of skill and responsibility" recommended by the Employment Relations Study Commission, it is my opinion that the equal pay principle referred to in sec. 230.09 (2)(b), Stats., is the same as that contained in the federal Equal Pay Act. I cannot construe sec. 230.09 (2)(b), Stats., as a drastic departure from traditional equal pay principles absent more express legislative direction. The one difference is that sec. 230.09 (2)(b), Stats., requires that classifications which include positions involving substantially similar or equal work be assigned to the same pay rates or ranges regardless of the sex of the employes in the classifications. The Equal Pay Act is limited to wage discriminations based upon sex.
IV. Application of sec. 230.09 (2) (b), Stats.
In enacting sec. 230.09 (2) (b), Stats., the Legislature did not provide for an immediate equalization of pay for classifications which include positions involving substantially similar or equal work. As the Employment Relations Study Commission observed, the differences in compensation are "related to the influence of the general job market and the general societal patterns of paying lower salaries for jobs traditionally filled by women . . . [and] [t]hese are considerations which cannot be ignored by the state as a responsible employer."Report, p. 34. Consequently, the Commission urged the Legislature to adopt as a goal the "eventual elimination" of such wage differences. Id.
Section 230.09 (2) (b), Stats., is designed to accomplish that goal. Whenever the administrator now and in the future assigns a classification to a pay range, the administrator must compare that classification to other classifications in the same and in different occupational groups which include positions involving substantially similar or equal work. For example, in response to your first question, when the *Page 200 
administrator assigns a clerk classification in the clerical occupational group to a pay range, the administrator should not assign that classification to a lower pay range than the pay range to which a different clerk classification in a different occupational group is assigned if the work performed in the two classifications is "of equivalent skills and responsibilities,"i.e., substantially similar or equal. On the other hand, the administrator would not be required to assign a particular classification in the clerical occupational group to the same pay range as a different classification in a different occupational group where the work is dissimilar merely because on some point system the work involves comparable skills and responsibilities.
Further, market forces, as noted by Employment Relations Study Commission, are not to be wholly ignored. In establishing pay rates and ranges, sec. 230.12 (1) (b), Stats., requires consideration of "provisions prevalent in schedules used in other public and private employment." Similarly, sec. 230.12 (3)(a), Stats., requires that compensation plan proposals "be based upon . . . data collected as to rates of pay for comparable work in other public services and in commercial and industrial establishments." Thus, the Legislature did not require that in striving to achieve the equal pay goal, the state should ignore compensation differences which would frustrate the purpose of state civil service law, i.e., "to provide state agencies . . . with competent personnel who will furnish state services . . . as fairly, efficiently and effectively as possible." Sec. 230.01
(1), Stats. Moreover, in providing that the administrator shall "use job evaluation methods which . . . are appropriate to the class or occupational groups," sec. 230.09 (1), Stats., the Legislature recognized that there may be valuation differences between occupational groups, and this recognition must be taken into account when applying the equal pay principle and determining whether work is of equal skill and responsibility.
The application of the equal pay principle referred to sec.230.09 (2)(b), Stats., in view of the above general guidelines, is committed to the discretion and expertise of the administrator in the first instance. When approving the administrator's actions under sec. 230.09 (2)(b), Stats., the Personnel Board must bring to bear its independent discretion and expertise. Both the administrator and the Board must carefully evaluate the available evidence to determine whether the work involved in various classifications is substantially *Page 201 
similar or equal, and must determine the weight to be given to market forces when assigning a particular classification to a pay range.
V. Retroactive Approval of the Classification Survey.
Your second question is whether the Personnel Board is authorized to approve a classification survey retroactively. What you are really asking is whether a classification plan, once approved, can be given retroactive effect. It is my opinion that the Board does not have such authority.
In my opinion, the Personnel Board acts in a quasi-legislative capacity in assigning classifications to ranges when it acts pursuant to sec. 230.09, Stats. Being quasi-legislative, its acts have prospective effect only. In establishing grades and classifications, the administrator is to use appropriate "job evaluation methods." Sec. 230.09 (1)(intro.), Stats. The evaluation process is not static; it is continuous and on-going because the value of various services changes with time. The valuation process is part and parcel to the process by which the administrator "may reclassify and reallocate positions." Sec.230.09 (2)(a), Stats. The administrator's duty is to "improve the classification plan to meet the needs of the service," sec.230.09 (2)(am), Stats., and those needs themselves change with time. Subject to the board's approval, the administrator upon "subsequent review . . . may reassign classes to different pay ranges." Sec. 230.09 (2)(b), Stats.
Essentially, then, the process of assigning classifications to ranges involves reassessment of the value of services in light of changing times, different needs, and improved methods of valuation. It is designed to realign to meet current conditions; it is not designed as a quasi-judicial process to reverse past decisions. Were it so designed, the task would entail a reverse domino effect reducing the range of some and increasing that of others. Such a retroactive reversal of past decisions cannot fairly be implied from the language employed in sec. 230.09, Stats. Moreover, inasmuch as the evaluation process is essentially judgmental as to value and need, this retroactive reversal conceivably would violate Wis. Const. art. IV, sec. 26, which provides that the Legislature shall never grant "any extra compensation to any public officer, agent, servant or contractor, after the services shall have been rendered or the contract entered into." This is not to say, however, that in individual cases nonevaluative and clerical mistakes *Page 202 
could not be corrected, nor that the constitution prevents agreement with an employe to make a tentative classification/range assignment pending a more thorough audit with retroactive adjustments. Rather, it appears to be the legislative intent under sec. 230.09, Stats., that the administrator and the board act prospectively in the implementation of the plan.
BCL:DCR